**Not for Publication**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

    *Plaintiff*,

  v.

BARAKAA WELTON,

    *Defendant*.

Crim. No. 18-487

**OPINION**

**John Michael Vazquez, U.S.D.J.**

    This matter comes before the Court by way of Defendant Barakaa Welton's motion to modify his sentence and for immediate compassionate release. D.E. 38. The Government filed opposition, D.E. 40, to which Welton replied by way of letter brief. The Court reviewed the parties' submissions[1] and considered the motion without oral argument pursuant to Local Criminal Rule 1.1 and Local Civil Rule 78.1(b). Defendant seeks immediate release due to the ongoing COVID-19 pandemic. For the following reasons, Defendant's motion is denied.

**I.    BACKGROUND**

    **A.  Underlying Criminal Proceeding**

    On August 17, 2018, Welton was indicted on two counts: Count One – felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); Count Two – possession with intent to distribute various controlled substances in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C). D.E. 1. The

---

[1] Defendant's brief in support of his motion is referred to as "Br." (D.E. 38); the Government's opposition brief is referred to as "Opp." (D.E. 40); and Defendant's reply letter brief is referred to as "Reply."

Government and Welton then entered into a written plea agreement, in which Welton agreed to plead guilty to Count One.  D.E. 28.  The parties also agreed to certain stipulations, which were not binding on the Court.  *Id.* at 7-9.  Welton then pled guilty on February 19, 2019.  D.E. 26.  Welton was thereafter sentenced on June 7, 2019.  D.E. 33.  The Court sentenced Welton consistent with the stipulations in the plea agreement.  Specifically, the Court sentenced Welton to a term of 37 months imprisonment followed by three years of supervised release.  D.E. 35.

Welton is currently housed at FCI Schuylkill in Pennsylvania.  He began serving his sentence on July 12, 2019.  Welton is currently scheduled to be released on December 17, 2021.

### B.  COVID-19 Pandemic

COVID-19 "is caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from person-to-person."  *Coronavirus Disease 2019 (COVID-19)*, "COVID-19 Overview and Infection Prevention and Control Priorities in non-US Healthcare Settings," Centers for Disease Control and Prevention (Aug. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/ overview/index.html#background.  "COVID-19 is primarily transmitted from person-to-person through respiratory droplets.  These droplets are released when someone with COVID-19 sneezes, coughs, or talks."  *Id.*  Persons who contract the virus reflect a wide range of symptoms from asymptomatic to mild (including fever, cough, nausea, chest pain, and body pain) to severe to critical (including respiratory failure and death).  *Id.*  Currently, there is no known cure for COVID-19.  As a result, standard precautions to prevent the spread of the virus include social distancing, proper hygiene, personal protective equipment (including use of a face mask), and maintenance of clean surfaces and devices.  *Id.*

Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. As a person get older, his/her risk for severe illness from COVID-19 increases. *Coronavirus Disease 2019 (COVID-19)*, "Older Adults," Centers for Disease Control and Prevention (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. For example, persons in their sixties and seventies are at a higher risk than people in their fifties. *Id.* Those eighty-five or older are at greatest risk. *Id.*

The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic obstructive pulmonary diseases, heart conditions such as coronary artery disease, weakened immune system from organ transplant, obesity, pregnancy, sickle cell disease, smoking, and type 2 diabetes mellitus. *Coronavirus Disease 2019 (COVID-19)*, "People with Certain Medical Conditions," Centers for Disease Control and Prevention (Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Persons who have the following medical conditions might be at an increased risk: asthma, cerebrovascular disease, cystic fibrosis, hypertension, immunocompromised state, neurologic conditions, liver diseases, pulmonary fibrosis, thalassemia, type 1 diabetes mellitus. *Id.*

Finally, racial and ethnic minorities may also be at an increased risk due to societal inequities, such as access to health care and poorer living conditions. *Coronavirus Disease 2019 (COVID-19)*, "Health Equity Considerations and Racial and Ethnic Minority Groups," Centers for Disease Control and Prevention (July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html. Factors to be considered are discrimination;

healthcare access and utilization; occupation; educational, income, and wealth gaps; and housing. *Id.*

As of November 16, 2020, the United States had 10,984,398 COVID-19 cases, which resulted in 245,470 deaths. *CDC COVID Data Tracker*, "United States COVID-19 Cases and Deaths by State," https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed Nov. 16, 2020).

### 1. Federal Bureau of Prisons

The Federal Bureau of Prisons ("BOP") has taken the following steps to combat the virus. On March 13, 2020, the BOP modified its operations in accordance with its "COVID-19 Action Plan." *Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Initially, all social visits, inmate movement, and official staff travel were suspended for thirty days. *Id.* Contractors who enter any BOP facility are screened for the virus, and initially admission was limited to contractors who performed essential services. *Id.* The BOP also conducts enhanced health screenings for staff in areas of "sustained community transmission." *Id.* The BOP screens all new inmates for virus "exposure risk factors and symptoms." *Id.* Any new inmate who is asymptomatic but has had a risk of exposure is quarantined. *Id.* According to the Government, the quarantine period is for a minimum of fourteen days or until cleared by medical staff. Opp. at 5. The Government indicates that new inmates who are symptomatic are placed in isolation until they test negative for the virus or are cleared by medical staff. *Id.* The Government also states that the BOP has taken the following steps to prevent the spread of the virus: group gatherings are limited to permit social distancing as much as possible, all staff and inmates have been issued face masks, and all staff and

inmates are strongly encouraged to wear face masks when social distancing cannot be achieved. *Id.*

As of November 16, 2020, the BOP COVID-19 statistics are as follows: (1) currently, 3,336 inmates and 1,078 staff have confirmed positive tests; (2) 17,635 inmates and 1,638 staff have recovered; and (3) 140 inmates and 2 staff have died. *COVID-19 Cases*, Bureau of Prisons (Nov. 16, 2020), https://www.bop.gov/coronavirus/index.jsp. FCI Schuylkill – where Defendant is housed – has fortunately fared better. When Welton made his initial request to be released, FCI Schuylkill did not have any reported cases. As of November 16, 2020, FCI Schuylkill has 4 positive cases among staff, as well as 1 inmate and 1 staff member who have recovered. *Id.*

### 2. New Jersey

New Jersey has been particularly hard hit by the pandemic. New Jersey has taken numerous affirmative steps, such as the Governor's stay-at-home order issued on March 21, 2020, to combat the virus. In addition, New Jersey initially closed schools indefinitely and closed beaches, state parks, and county parks. When the number of New Jersey cases started to decline, many of the initial restrictions were lifted or relaxed. However, New Jersey is now facing another uptick in positive cases, and the Governor recently issued new mitigation orders. *Governor Murphy Announces New COVID-19 Mitigation Measures*, New Jersey COVID Information Hub (Nov. 11, 2020), https://covid19.nj.gov/faqs/announcements/all-announcements/governor-murphy-announces-new-covid-19-mitigation-measures. As of November 16, 2020, New Jersey has 281,493 cases and a resulting 14,779 deaths. *Data Dashboard*, New Jersey COVID Information Hub (Nov. 16, 2020), https://covid19.nj.gov. Essex County, where Defendant indicates he would live if released, has had 30,423 cases with 1,944 deaths, including 191 new cases. *Id.*

### C. Welton's Relevant Conditions

Defendant is 31 years old. He suffers from chronic asthma and hypertension. On April 6, 2020, Welton wrote to the Warden of FCI Schuylkill, seeking his release for the same reasons he raises now. On April 10, 2020, the Warden denied Defendant's request. *Id.* at 20-21.

## II. LEGAL STANDARD

Following the passage of the First Step Act, Section 3582(c)(1)(A) now reads as follows:

(c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) *extraordinary and compelling reasons warrant such a reduction*; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and *a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)*;

*and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and

(B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and

(2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the

> Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphases added). The parties agree that Defendant has satisfied the statutory exhaustion requirement. Opp. at 4.

The applicable policy statement of the United States Sentencing Commission is found in Section 1B1.13. U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018). The application notes to the section provide four circumstances that can be considered extraordinary and compelling: (1) the medical condition of the defendant, (2) the age of the defendant, (3) family circumstances, and (4) other circumstances constituting an extraordinary or compelling reason, either considered alone or in combination with any of the other three stated reasons. *Id.* cmt. n. 1(A)-(D).

In the application note, the fourth consideration requires a determination by the Director of the BOP. *Id.* cmt. n. 1(D). Here, the Government does not contest that the policy statement should also apply when the motion is filed by a defendant, in addition to a motion filed by the BOP Director. The Court also finds that the policy statement applies here, although this has been a point of contention in similar cases. In *United States v. Rodriguez*, 451 F. Supp. 3d 392, (E.D. Pa. 2020), United States District Judge Anita Brody confronted the same issue. Ultimately, Judge Brody held that the fourth provision also applies when the motion is made by a defendant. *Id.* at 400. Judge Brody noted that her determination was in accord with the majority view. *Id.* at 397 (collecting cases). Judge Brody also persuasively explained her decision as follows:

> Under the First Step Act, however, it is possible for inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for

7

relief. Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where nobody in the BOP *ever* decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions.

It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. . . . This would have the perverse effect of *penalizing* prisoners who take advantage of the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate.

That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications."). . . . Congress sought to help, not hinder, these sorts of prisoners . . . . Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.

Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term "extraordinary and compelling." Because the Sentencing Commission has not issued a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach. Accordingly, as a result of the First Step Act, there is simply a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill. Nothing in § 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these. Rather, the statute's text directly instructs *courts* to "find that" extraordinary circumstances exist.

*Id.* at 399-400 (emphases in original).

Pursuant to Section 3582(c)(1)(A), the Court must also consider the factors listed in 18 U.S.C. § 3553(a). They include the nature and circumstances of Defendant's offense, the history and characteristics of Defendant, the need for the sentence to provide just punishment, and the need to protect the public from future offenses of Defendant. *Id.*

### III. ANALYSIS

Welton indicates that, in light of the pandemic, he should be released because of his medical conditions and because he is male. Br. at 7-13; Reply at 1-2. Welton states that if he is released, he will live with his brother in Newark, New Jersey. In opposition, the Government indicates that Welton's medical conditions do not countenance his release. Opp. at 11-12. The Government continues that the conditions at FCI Schuylkill also militate against granting relief as to the Section 3553(a) factors. *Id.* at 12-16.

The Court finds that Welton has not met his burden in demonstrating extraordinary and compelling reasons to justify his release. Welton's asthma and hypertension potentially make him more at risk of suffering an adverse outcome should he contract the virus. This factor weighs in favor of Defendant's request.

However, the Court finds that Defendant has not met his burden as to extraordinary and compelling circumstance because FCI Schuylkill has not suffered any serious outbreak of cases. This fact is critical. When Defendant first filed his request to be released with the Warden, the facility did not have any cases. Since then, there have been a total of four cases, with three of them involving staff. One of the staff members, as well as the lone inmate who tested positive, have

recovered.[2]  Statistically, FCI Schuylkill is much safer for Defendant than Essex County, where he wishes to be released.

Welton, among other things, attacks the testing methods of the BOP.  This may be a fair criticism.  But Welton has not presented any evidence that the number of reported cases at FCI Schuylkill is inaccurate.  Thus, it appears that the BOP's efforts, at least in regard to FCI Schuylkill, are currently working.  Welton also does not challenge the Government's information that staff, contractors, and new inmates are screened for the virus before entering.  Once a facility is confident that its inmate population does not have the virus, it appears that preventing any positive cases from entering the facility – through screening – is crucial.

Finally, given the recency of Welton's sentencing, the Court's Section 3553(a) analysis at that time is still applicable.  Welton has not pointed to any new information that would change the Court's review of the factors.

For the foregoing reasons, the Court denies Welton's motion.  However, the Court does so without prejudice.  The pandemic, unfortunately, has been battering our country with a second surge, and circumstances could materially change.

## IV.    CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion.  An appropriate Order accompanies this Opinion.

Dated:  November 17, 2020

                                                                     John Michael Vazquez, U.S.D.J.

---

[2] The Government indicates that the sole inmate who tested positive informed the BOP of the positive result before the inmate's surrender.  In response, the BOP placed the inmate in isolation and he never had contact with other inmates.  Opp. at 7.